```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
In re:                                 :
                                       :
LORAL SPACE & COMMUNICATIONS LTD., et  :        08 CV 10935 (JSR)
al.,                                   :
                                       :        MEMORANDUM ORDER
            Reorganized Debtors.       :
                                       :
------------------------------------ x
                                       :
TAHOE DBS, LLC,                        :
                                       :
            Appellant,                 :
                                       :
            -v-                        :
                                       :
LORAL SPACE & COMMUNICATIONS LTD., et  :
al.,                                   :
                                       :
            Appellees.                 :
------------------------------------ x
```



JED S. RAKOFF, U.S.D.J.

        Tahoe DBS, LLC ("Tahoe") appeals from an order of the United

States Bankruptcy Court, Southern District of New York (Drain, B.J.),

granting the Amended Objections to Tahoe's Claims asserted by Loral

Space & Communications Ltd. ("Ltd.") and four of its subsidiaries

(collectively, the "Loral Entities" or "Debtors").  On appeal, Tahoe

argues that the Bankruptcy Court improperly determined that Debtor

LSCC (one of Ltd.'s subsidiaries) was alone liable for Tahoe's

claims, instead of determining that liability should be borne jointly

and severally among all of the Debtors (including Ltd.).  The Court

disagrees, and hereby affirms the Bankruptcy Court's order.

        The instant appeal turns on the meaning of the term "Loral"

as used in an October 29, 2001 Settlement and Apportionment Agreement

("Apportionment Agreement" or "Agreement"), that was expressed as being "by and between:"

> (1)    Loral SpaceCom DBS, Inc., Loral SpaceCom DBS
> Holdings, Inc., Space Systems/Loral, Inc., Loral Space
> & Communications Ltd., and Loral SpaceCom Corporation
> (collectively, "Loral"), on behalf of themselves, their
> parents, subsidiaries, and their respective officers,
> directors, and shareholders, and including any and all
> predecessors, successors and assigns . . .
>
> (2)    R/L-DBS . . ., Rainbow Media Holdings, Inc., and
> Rainbow DBS Holdings, Inc. ["Rainbow"]; and
>
> (3)    Tahoe DBS, LLC.

Declaration of Theodore E. Tsekerides ("Tsekerides Decl.") Ex. 1 at 1 (emphasis added). All five of the Loral entities executed the Agreement, which contained a choice-of-law provision for California law. Id. at 10, 12. In the Agreement, Tahoe released the Loral entities from all claims it had against them, covenanted not to sue the Loral entities, transferred claims it had against certain non-settling parties to a joint venture, and conveyed all of its rights under a 1996 Share Purchase Agreement. Id. at 2, 4, 6. In exchange for the foregoing, Tahoe was granted the right to receive a portion of the proceeds from the sale of an interest in R/L-DBS to Rainbow. Specifically, paragraph 9 of the Agreement provided:

> TRANSFER BY LORAL TO TAHOE OF A PORTION OF LORAL'S
> RIGHTS SET FORTH IN THE LORAL-RAINBOW LETTER AGREEMENT
> DATED MARCH 23, 2001:  In consideration of the mutual
> covenants and conditions contained in the Settlement
> Agreement and this Apportionment Agreement, Loral
> hereby grants to Tahoe DBS the right to receive three
> million dollars ($3 million) of the total amount of
> proceeds, if any, received by Loral pursuant to its
> sale of its interest in R/L-DBS under the March 23,
> 2001 Agreement.  To the extent that such proceeds are

2

received by Loral, Tahoe shall receive one eleventh
(1/11th) of any such amounts on a pro rata basis.

Id. at 9 (emphasis added).

Pursuant to the March 23, 2001 Agreement referenced in
paragraph 9 ("the Letter Agreement"), Loral SpaceCom DBS Holdings,
Inc. ("SpaceCom DBS") (a party to the Apportionment Agreement and one
of the Loral entities) conveyed its interest in R/L-DBS to Rainbow,
and Rainbow agreed that if it sold "all or substantially all of the
assets" of R/L-DBS to a third party, it would, in turn, pay SpaceCom
DBS $33 million.  Id. Ex. 4.  SpaceCom DBS was the only Loral entity
that was a party to the Letter Agreement and the only Loral entity
that (through its successor, Loral Space & Communications Corporation
("LSCC")) received the funds from Rainbow claimed by Tahoe under the
Apportionment Agreement.  Id. Exs. 4 and 17.[1]

On July 13, 2003, the Debtors filed voluntary petitions for
relief under Chapter 11.  Thereafter, on November 27, 2003, the
Debtors each filed their respective Schedules of Assets and
Liabilities.  LSCC did not list the Apportionment Agreement (or any
other potential liability to Tahoe, for that matter) in its
schedules.  Declaration of Thomas O. Bean ("Bean Decl.") Ex. 24.
Loral SpaceCom Corporation, SS/L, and Ltd., by contrast, each listed

---

[1] On March 26, 2002, SpaceCom DBS was dissolved and, as of
that date, conveyed all of its assets, including the right to
receive any proceeds under the Letter Agreement, to LSCC, its
corporate parent and sole shareholder.  See Tsekerides Decl. Ex.
7 (corrected certificate of dissolution dated March 3, 2005); id.
Ex. 8 (letter assignment agreement between SpaceCom DBS and
LSCC).  On June 24, 2005, LSCC was renamed Loral Space &
Communications Holdings Corp. ("LSCHC").  Id. Ex. 9.

the Apportionment Agreement as an executory contract.  Id. Exs. 22, 23, 25.  On January 26, 2004, Tahoe filed proofs of claim in each of the Debtors' bankruptcy cases, asserting general unsecured claims in the principal amount of "at least $3 million" arising out of the Apportionment Agreement and noting that Tahoe did "not know which entity or entities among the Debtor Parties or the other Debtors, if any, may have succeeded to the interests of the DBS Parties under the Agreements."  See, e.g., Tsekerides Decl. Ex. 2.

On December 5, 2004, the Debtors filed their Second Plan, under which general unsecured creditors of SpaceCom, SS/L, and LSCC could elect to receive their dividend in stock or in cash.  See Bean Decl. Ex. 2.  On February 24, 2005, the Debtors filed their First Objection, in which they sought to expunge all of Tahoe's claims, except those as to Loral SpaceCom Corporation, as duplicative.  Id. Ex. 4.  On March 25, 2005, in response to Debtors' First Objection, attorneys for Tahoe contacted the Debtors, arguing that "it's premature to knock out any of the proofs of claim given that, among other things, Tahoe doesn't fully know where the Loral liabilities wound up."  Tskerides Decl. Ex. 3.

On August 1, 2005, the Bankruptcy Court entered an order confirming the Confirmed Plan, which, unlike the Second Plan, provided that general unsecured creditors of SpaceCom and SS/L would receive a cash dividend equal to 100% of their allowed claims, while general unsecured creditors of LSCC would receive stock valued at 34% of their claims.  See Docket No. 2255; Bean Decl. Ex. 6 at 7, 11-12.

4

Meanwhile, in January 2005, Rainbow entered into an agreement to sell substantially all of its assets (including its interest in R/L DBS), thus triggering Rainbow's obligation to pay SpaceCom DBS $33 million under the Letter Agreement and Tahoe's concomitant right to a portion of those proceeds under the Agreement. In September 2005, after Rainbow indicated its intention not to make payment pursuant to the Letter Agreement, LSCHC (as successor to SpaceCom DBS and LSCC), filed a declaratory judgment action against Rainbow seeking payment in New York Supreme Court. Tsekerides Decl. Ex. 17. On March 12, 2007, the court entered judgment in favor of LSCHC, Bean Decl. Ex. 7 ¶ 25, and on July 10, 2008, the Debtors advised Tahoe that payment had been made. Id. Ex. 21. On September 15, 2008, the Debtors filed an Amended Objection to Tahoe's claims, seeking an order (1) allowing Tahoe's claim against LSCC; and (2) disallowing and expunging Tahoe's remaining claims as duplicative. Bean Decl. Ex. 7.

By order dated November 3, 2008, the Bankruptcy Court granted Debtors' Amended Objection, id. Ex. 10, based on its conclusion that paragraph 9 of the Apportionment Agreement created an obligation that is owed solely by LSCC (as the successor to SpaceCom DBS), and not by any of the other Loral entities.

The instant appeal principally calls upon this Court to interpret the meaning of the term "Loral" as used in paragraph 9 of the Agreement. Under California law (here applicable), "[t]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of

5

contracting." <u>Miller v. Glen Miller Prods., Inc.</u>, 454 F.3d 975, 989 (9th Cir. 2006). Unlike the laws of most states, however, which generally disallow the use of extrinsic evidence to interpret an unambiguous integrated contract, California law requires courts to look to all "objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties." <u>City of Atascadero v. Merrill Lynch</u>, 80 Cal. Rptr. 2d 439, 349 (Cal. Ct. App. 1st Dist. 1998) (citations omitted); <u>see</u> <u>Morey v. Vannucci</u>, 75 Cal. Rptr. 2d 573, 578 (Cal. Ct. App. 1st Dist. 1998) ("Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible"); <u>see also</u> <u>TIG Premier Ins. Co. v. Hartford Accident & Indem. Co.</u>, 35 F. Supp. 2d 348, 350 (S.D.N.Y. 1999) (same).

Accordingly, when parties dispute the meaning of the language of a contract, courts applying California law first "provisionally receive[] any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." <u>Wolf v. Walt Disney Pictures and Television</u>, 76 Cal. Rptr. 3d 585, 602 (Cal. Ct. App. 2d Dist. 2008). If, in light of the proffered extrinsic evidence, the contract is deemed "fairly susceptible" of the interpretation urged, such evidence is admitted

6

to aid the Court in interpreting the contract. <u>Pac. Gas & Elec. Co.</u>
<u>v. G. W. Thomas Drayage & Rigging Co.</u>, 69 Cal. 2d 33, 40 (1968).

Here, in light of the foregoing principles, the Bankruptcy
Court was plainly correct in concluding that, under paragraph 9 of
the Agreement, LSCC alone is liable for Tahoe's claims.[2]

As noted, the Apportionment Agreement defines "Loral" to
refer collectively to all of the Debtors. Accordingly, Tahoe argues
that interpreting the word "Loral" in paragraph 9 to mean all of the
Debtors would be consistent with the use of that term throughout the
Agreement and that any other reading would result in the word "Loral"
having different meanings in different parts of the Agreement. <u>See</u>
<u>Levi Strauss & Co. v. Aetna Cas. & Sur. Co.</u>, 237 Cal. Rptr. 473, 477
(Cal. Ct. App. 1st Dist. 1986) (under California law, "words used in
a certain sense in one part of a contract are deemed to have been
used in the same sense elsewhere in that instrument"). Other

---

[2] The Bankruptcy Court was not entirely clear in its
recitation of the applicable legal principles. At one point, the
court stated that California's approach to contract
interpretation is "the same as . . . contract interpretation
under New York law," Tsekerides Decl. Ex. 11 at 2, a statement
that, at least on its face, is incorrect. At another point,
however, the Bankruptcy Court observed that it did not "see
anything to dispute the debtors' contention here that only the .
. . successor of the party to the [Letter Agreement] received
those proceeds," and that it did not "see anything in the record
to show that someone else received that money," <u>id.</u> Ex. 10 at 2,
15, thus indicating that the Bankruptcy Court nevertheless
considered the parties' proffered extrinsic evidence in
accordance with well-established California law regarding
contract interpretation. In any event, this Court need not
determine whether the Bankruptcy Court properly applied
controlling, applicable law, because, upon <u>de</u> <u>novo</u> review,
application of the correct legal principles supports the
Bankruptcy Court's ultimate conclusions.

provisions contained in the Agreement, however, make use of the term
"Loral" when they clearly pertain to an obligation of an individual
Loral entity.  For example, Paragraph 8 provides that "Loral" and
Rainbow "hereby amend the terms of the [Letter Agreement] as follows
. . . ."  Tsekerides Decl. Ex. 1.  Paragraphs 1(a), 1(c), 2(a), 2(c),
and 7 likewise refer to the letter agreement between "Loral and
Rainbow."  Id.  As noted, however, SpaceCom DBS was the only "Loral"
entity that was a party to the Letter Agreement, thus demonstrating
that the term "Loral," as used in these paragraphs, can refer to no
entity other than SpaceCom DBS.  In other words, it is apparent that
the parties intended the term "Loral" to refer to specific Loral
entities in those provisions of the Agreement where it simply would
make no sense, and would be contrary to known facts, to refer to the
Loral entities collectively.  See Levi Strauss, 237 Cal. Rptr. at 477
(in interpreting a contract, courts should not "create an ambiguity
where none exists") (internal citations omitted).

        Both parties proffer a variety of pieces of extrinsic
evidence to support their competing interpretations of the
Apportionment Agreement; but the Court finds the Letter Agreement to
be the most persuasive and relevant piece of evidence for purposes of
interpreting the term "Loral" as used in paragraph 9.  As noted, the
Letter Agreement is referenced throughout the Apportionment Agreement
(including in paragraph 9), and is the very document that gives rise
to Tahoe's claims, thus providing strong evidence of the parties'
intent at the time of the execution of the Apportionment Agreement.
See Pac. Gas & Elec. Co., 69 Cal. 2d at 40 (courts are required to

8

look to the "circumstances surrounding the making of the agreement .

. . including the object, nature and subject matter of the writing .

. . so that the court can place itself in the same situation in which

the parties found themselves at the time of the contracting")

(citations and quotations omitted); <u>Universal Sales Corp. v. Cal.</u>

<u>Press Mfg. Co.</u>, 20 Cal. 2d 751, 761 (1942) ("As an aid in discovering

the all-important element of intent of the parties to the contract,

the trial court may look to the circumstances surrounding the making

of the agreement").

Notably, SpaceCom DBS was the only Loral entity that was a

party to the Letter Agreement, and the only Loral entity that

(through its successor, LSCC) received the funds from Rainbow claimed

by Tahoe under the Apportionment Agreement.  Thus, the Letter

Agreement conclusively establishes that, under paragraph 9, certain

obligations of "Loral" were capable of being performed only by

SpaceCom DBS, and not by the Loral entities as a whole.  <u>See</u> <u>Douglas</u>

<u>v. Bergere</u>, 210 P.2d 727, 730 (Cal. Ct. App. 2d Dist. 1949) (noting

that the proffered extrinsic evidence "was sufficient to justify the

court in concluding that the contract was several and not joint and

several").  Indeed, SpaceCom DBS's ultimate successor, LSCHC, was the

only Loral entity that was named as a plaintiff in the lawsuit

against Rainbow to recover the proceeds of the Letter Agreement,

presumably because no other Loral entity had the contractual right to

demand such funds.

Likewise, as noted, the Letter Agreement pre-dates the

Apportionment Agreement and was known (and referenced) by the parties

9

at the time of the Agreement's execution.  When read in the context
of the Letter Agreement itself, paragraph 9 of the Apportionment
Agreement unequivocally refers to Tahoe's right to receive a portion
of the proceeds from the sale of an interest in R/L-DBS to Rainbow,
proceeds that only LSCC (as successor to SpaceCom DBS) was entitled
to receive.  Tahoe has failed to point to any piece of extrinsic
evidence that demonstrates that any other Loral entity other than
SpaceCom DBS was entitled to payment under the Letter Agreement.
Thus, because the remainder of the Loral entities were not entitled
to receive (nor did they receive) the funds under the Letter
Agreement, it is clear that they have no obligation to satisfy
Tahoe's claims under the Apportionment Agreement.

     Tahoe relies extensively on a variety of post-contractual,
pre-dispute pieces of extrinsic evidence to support its arguments,
contending that such evidence is most relevant to ascertaining the
parties' intentions.  <u>See</u>, <u>e.g.</u>, <u>Employers Reins. Co. v. Superior
Court</u>, 74 Cal Rptr. 3d 733, 745 (2d Dist. 2008) (admitting evidence
of the parties' course of performance, noting that "[t]he conduct of
the parties after execution of the contract and before any
controversy has arisen as to its effect affords the most reliable
evidence of the parties' intentions").  Tahoe's proffered extrinsic
evidence, however, does not relate to the parties' course of
performance or course of dealing under the Apportionment Agreement,
and thus sheds little light on the parties' intentions at the time
the agreement was executed.  Indeed, the evidence proffered by Tahoe
is, at best, inconclusive as to the parties' intent concerning the

meaning of the term "Loral" as used in paragraph 9.  This is so for
at least four reasons.

First, although Tahoe attempts to draw a variety of
inferences from the various objections made by the Debtors to Tahoe's
claims, and argues that the First Objection (which sought to expunge
all claims except those as to Loral SpaceCom Corporation) should be
viewed as the most reliable evidence of the Debtors' understanding of
the Agreement, Tahoe fails to demonstrate how Debtors' objections —
which were filed nearly three years after the parties executed the
Apportionment Agreement — shed any light on the intent of the parties
at the time of the Agreement's execution or demonstrate any course of
conduct or performance between the parties.  Indeed, Tahoe itself
challenged Debtors' First Objection, and noted that it was
"premature" to expunge any claims because Tahoe did not yet know
"where the Loral liabilities wound up."  Ultimately, the Debtors'
First Objection merely shows that Debtors believed (apparently
incorrectly) that only SpaceCom Corporation was liable under the
Agreement.  Such evidence is, at best, inconclusive of the parties'
intent as to whether or not the Debtors should be held jointly and
severally liable.

Second, although Tahoe notes that SpaceCom DBS's Corrected
Certificate of Dissolution stated that it "ha[d] no known liabilities
or obligations" and argues that Debtors cannot "play fast and loose"
by now claiming that only SpaceCom DBS (through its successors) is
liable under the Agreement, Debtors' obligations under the Agreement
were entirely contingent on the receipt of proceeds under the Letter

Agreement, and, in any event, the Corrected Certificate of
Dissolution has no bearing on the ultimate question of which Loral
entities are liable for Tahoe's claim.

Third, although Tahoe notes that Loral SpaceCom Corporation,
SS/L, and Ltd. each listed the Apportionment Agreement in their
bankruptcy schedules, while LSCC (as SpaceCom DBS's successor) did
not, these schedules fail to give rise to any inference that all of
the Debtors are jointly and severally liable under the Apportionment
Agreement; instead, they merely indicate that the Debtors, at the
time they issued their schedules, thought that
Loral SpaceCom Corporation, SS/L, and Ltd. were all parties to an
executory contract, and are thus inconclusive as to the parties'
intent at the time they entered into the Apportionment Agreement.

Fourth, although Tahoe points to the Debtors' March 31, 2005
10-Q form, which defines "Loral" to mean "Loral Space &
Communications Ltd. and its subsidiaries," and which indicates that
"Loral" would receive proceeds under the Letter Agreement, Tsekerides
Decl. Ex. 13 at 36, 44-45, the use of the term "Loral" in a public
filing made nearly three years after the execution of the
Apportionment Agreement bears little significance on the meaning of
the term "Loral" as used in paragraph 9 of the Agreement, which was
premised directly on the rights and obligations set forth in the
Letter Agreement.

In short, although Tahoe's proffered extrinsic evidence may
illustrate some confusion and disagreement among the parties as to
which Loral entity was liable under the Apportionment Agreement, it

12

fails to show that the parties intended all of the Debtors to be jointly and severally liable to Tahoe.   Instead, the Letter Agreement, the most persuasive and relevant piece of evidence before this Court, when read in conjunction with the Apportionment Agreement, conclusively demonstrates that LSCC was alone liable for Tahoe's claim.

Finally, Tahoe argues that California's presumptions of joint and several liability apply in this case, and thus require the Apportionment Agreement to be read to impose liability upon all of the Debtors.   The Court disagrees.

California Civil Code section 1660 provides that a "promise, made in the singular number, but executed by several persons, is presumed to be joint and several," and California Civil Code section 1659 similarly provides that "[w]here all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several."   As Tahoe concedes, however, both of these presumptions are rebuttable, and can be trumped by evidence demonstrating that the parties did not intend the agreement to impose joint and several liability.   <u>See</u>, <u>e.g.</u>, <u>Douglas</u>, 210 P.2d at 728 (section 1660 only "controls in the absence of evidence to the contrary"); <u>Adamson v. Amchem Prods.</u>, 2006 Cal. App. Unpub. LEXIS 7956, at *9 (Cal. Ct. App. 1st Dist. Sept. 6, 2006) (characterizing the statutory presumptions created by sections 1659 and 1660 as "the weakest and least satisfactory character of evidence").

13

Here, paragraph 9 explicitly references the Letter Agreement, thus creating a separate and distinct obligation on the part of SpaceCom DBS and its successors and rebutting any presumption that all of the Debtors are jointly and severally liable. See, e.g., Int'l Interest Group, Inc. v. Forstmann, 2003 WL 22009676, at *2 (Cal. Ct. App. 2d Dist. Aug. 26, 2003) (noting that where a contract identifies one of multiple parties to a contract as liable for a contractual obligation, "the contract on its face rebuts the presumptions of sections 1659 and 1660"); Freeman v. Jergins, 271 P.2d 210, 227 (Cal. Ct. App. 2d Dist. 1954) ("Where two or more parties to a contract promise separate performance, to be rendered respectively by each of them, or where each of them makes only a separate promise that the same performance shall be rendered, each is severally bound for the performance which he promises and is not bound jointly with any of the others"). Moreover, in order to invoke these presumptions of joint and several liability, multiple signatories must execute or be "unite[d] in a promise." The promise memorialized in paragraph 9, however, was only capable of being performed by LSCC, as successor to SpaceCom DBS. In short, because the Apportionment Agreement, together with the Letter Agreement and all other proffered extrinsic evidence, demonstrates that the parties did not intend the Apportionment Agreement to impose joint and several liability, Tahoe's reliance on California's statutory presumptions is improper.

Accordingly, for all of the foregoing reasons, the Bankruptcy Court's Order Granting Amended Objection to Claims of Tahoe DBS, LLC

14

[Claim Nos. 900-906, 908-917 and 919-920] is hereby affirmed, and the instant appeal is dismissed.  Clerk to enter judgment.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        July 28, 2009

15